IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GERRIT-JAN VERMEER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:24-cv-290 |
| | § | |
| MAMMOET USA SOUTH, INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Gerrit-Jan Vermeer ("Plaintiff" or "Vermeer") files this Original Complaint against Mammoet USA South, Inc. ("Defendant").

## SUMMARY

1. Vermeer, a Dutch citizen, was employed by Defendant, the American subsidiary of a Dutch engineering services firm, for about seven years. In the course of working for Defendant on jobs throughout North America, Vermeer experienced a host of visa problems that separated him from his family for long stretches. Around June of 2023, Vermeer met with Defendant's President and Human Resources to see if the company could fulfill an oft-repeated promise to help him secure a Green Card. During the same meeting, Vermeer engaged in protected activity by reporting instances of discriminatory discipline along the lines of national origin. On August 15, 2023, Vermeer learned that he and just one other transport supervisor had been singled out among eighteen transport supervisors as part of a layoff. Vermeer's discharge was discriminatory based on national origin and retaliatory in violation of Title VII of the Civil Rights Act of 1964.

## THE PARTIES AND JURISDICTION

2. Plaintiff Gerrit-Jan Vermeer is a natural person with standing to file this lawsuit.

3. Defendant Mammoet USA South, Inc. is a Delaware corporation doing business in

the Southern District of Texas, Galveston Division.

4. Defendant may be served with this Complaint through its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

5. The Court has personal jurisdiction over Defendant based on specific jurisdiction.

6. The Court has subject matter jurisdiction over this case based on federal question jurisdiction under Title VII of the Civil Rights Act.

7. Venue is appropriate in the Southern District of Texas, Galveston Division, because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

8. For twelve years, Vermeer shouldered hefty responsibilities around the globe for Mammoet, a Dutch company that specializes in engineered heavy lifting and the transport of large objects.

9. Vermeer started his career with Mammoet in 2011 as an operator in the Netherlands. In 2014, he relocated his family to Australia when he accepted a management position as a leading hand with Mammoet Asia Pacific.

10. In 2016, Vermeer accepted another transfer to become a SPMT Supervisor for Defendant, Mammoet's American subsidiary, which is headquartered in Rosharon, Texas.

11. This latest move required Vermeer to uproot his family once again. In recognition of the challenges entailed by the big move, Defendant provided him with a relocation package. Defendant also handled the process of filing for Vermeer's employment-based nonimmigrant visa, which allowed him to legally work in the United States as a Dutch national.

12. Within the first year of his move to Texas, Vermeer asked Defendant to help him obtain a United States Permanent Resident ID Card ("Green Card"). Vermeer's family had fallen

in love with life in Texas, and his children were approaching adulthood but could not receive American social security numbers based on his visa status.

13.  Kim Oliver, a former human resources representative, was against the idea of Defendant sponsoring Vermeer's Green Card application, but others in the company were more receptive to the idea. In an email sent on February 16, 2017, Mammoet President Jacques Stoof expressed to Vermeer that he could expect the full cooperation of Mammoet if he went forward with his plans of pursuing a Green Card.

14.  Later in 2017, Mammoet Director Christiaan Lavooij ("Lavooij") traveled out to a project in Louisiana and met with Vermeer to discuss the costs and logistics of securing a Green Card. At some point in 2020, Lavooij's successor, Martijn Kuipers, again promised Vermeer the company's assistance in securing a Green Card, stating: "We'll take care of it." Alas, nothing happened.

15.  In June 2023, after six years of stasis, Vermeer brought the issue to the attention of Mammoet CEO Paul van Gelder ("van Gelder"). Van Gelder took the unique step of making inquiries from his office in the Netherlands into the matter with Defendant's human resources department in the United States.

16.  Vermeer's struggles to procure a Green Card pale in comparison to the travails that he and his family went through due to work-related visa issues in the past few years. Despite receiving assurances from Defendant's Human Resources Business Partner Karin de Villiers ("de Villiers") that his visa renewal near the end of 2018 would be handled promptly by the company, Defendant was late in completing the task.

17.  While corrective actions were taken, Vermeer was unable to work on projects out in the field for several months and was confined to overtime-ineligible work back in the yard without his usual per diem. This was a notable setback for Vermeer as his take-home pay could

nearly double based on overtime work he frequently picked up. When Vermeer informed Lavooij that Defendant's failure to renew his visa on time had caused his driver's license to lapse as well, Lavooij could offer nothing more than the suggestion that Vermeer try to "drive safely" in the meantime.

18. Remarkably, several years later, Defendant again failed in its obligation to keep Vermeer's visa in good working order. This time, owing to the effects of the COVID-19 pandemic, the oversight would have more dire consequences.

19. On September 14, 2021, Vermeer's direct manager, Randy Maxey ("Maxey"), sent him to Mexico for a work project. As always, de Villiers handled the travel and visa arrangements. Unbeknownst to Vermeer at the time, he would be unable to return to the United States for over sixteen months as a result.

20. Several weeks into the job, Vermeer received word from Defendant that he would be unable to return home to his family once the job was complete due to visa issues. He would have to travel to the United States Embassy in Amsterdam, Netherlands and attempt to remedy his visa issues there before he could return home to Texas. The catch was that the first open visa appointment in Amsterdam was not available for about six months due to interminable delays caused by the Covid-19 pandemic. Maxey told Vermeer that "we're good" because in the interim Vermeer could simply continue working in Mexico.

21. On March 27, 2022, Vermeer traveled from Mexico to the Netherlands for his visa appointment where he was reunited with his wife, who had traveled separately from the United States. Vermeer needed to apply for a new visa, but he quickly discovered at the embassy that this could not be done because Defendant had not supplied him with the appropriate certificate of enrollment. The clerk assisting with the process confirmed that this was a mistake on the part of Defendant's corporate lawyers, who had put together the paperwork.

22. Defendant had mistakenly treated the process as if it were a simple visa renewal, rather than a completely new visa application. Without this missing enrollment form, Vermeer could not receive a new visa and was forced to wait for a new appointment, which was not available until many months later.

23. As a result, Vermeer had to return to Mexico while his wife was now stuck in the Netherlands, both unable to return to the United States. During the seven months Vermeer's wife had to remain in the Netherlands, she had to forgo approximately $42,000.00 in lost income. In the meantime, their children were left to fend for themselves back in Texas without their parents.

24. When Vermeer informed de Villiers of this latest setback, she offered nothing in the way of an apology and seemed more concerned with ensuring that he return his rental car as soon as possible. In discussions with co-workers, Vermeer learned he was not the only victim of de Villiers's visa mistakes.

25. In January 2023, both Vermeer and his wife missed the birth of their second grandchild as a direct result of Defendant's latest visa oversight. Vermeer had previously missed the birth of his first grandchild, in February 2021, when Defendant would not allow him to take time off from a work assignment in Corpus Christi, Texas.

26. While working in Mexico, Vermeer witnessed several incidents that gave him cause for concern about aspects of Mammoet's company culture. In December 2021, José Luis (" Luis"), a Mexican operator, got into a physical altercation with individuals who were not Mammoet employees at a nightclub off of work premises and outside of work hours. Luis was terminated as a direct result.

27. Just two weeks later, Braxton Thompson ("Thompson"), an American superintendent, attended a company Christmas party in Mexico where he got into a fight with a co-worker, Charles McDowell. The company had supplied copious amounts of alcohol for the

party but did not arrange for transportation back to employee housing. A highly intoxicated Thompson proceeded to cap the night off by crashing a company car after leaving the party. Thompson was not terminated for this misconduct.

28. Vermeer recognized that the treatment of Luis in comparison to Thompson was discriminatory and unjust because Luis, a Mexican, was terminated for the same offense that Thompson, an American, was spared discipline for. Vermeer therefore resolved to raise this issue of discriminatory treatment with Defendant's managing director.

29. However, the sensitive nature of the topic and Vermeer's concerns that telling the wrong person this information might cost him his job led him to postpone the disclosure until he could return to the United States and discuss the matter in person. Vermeer's visa issues and the managing director's busy schedule meant that Vermeer was only able to raise the issue with Defendant's President/Managing Director John Halfweeg ("Halfweeg") in June 2023.

30. By the beginning of 2023, Vermeer was in Kitimat, British Columbia performing work for one of Defendant's clients. During this work stint, he resided in a dry dormitory located at the client's site.

31. On two separate occasions in mid-January 2023, Vermeer found empty bottles of Captain Morgan rum in the hallway of his dormitory while leaving the facility in the morning and disposed of them by placing them in trash containers. The bottles of rum did not belong to Vermeer, and he did not consume alcohol at the dry facility.

32. After reviewing security camera footage that showed Vermeer placing the empty bottles in trash containers, the client jumped to conclusions and decided to suspend Vermeer and revoke his site privileges despite a complete lack of evidence that Vermeer had actually consumed the alcohol. Vermeer was never afforded an opportunity by the client to explain that he was merely disposing of rum bottles that were not his.

33. Unable to complete his assignment in Canada due to this unfortunate misunderstanding, Vermeer was able to travel back to the Netherlands for a long-scheduled follow-up appointment at the U.S. Embassy. With his visa situation at last resolved, on January 27, 2023, Vermeer was able to fly back home to Houston where he was reunited with his family. The separation had stretched for over sixteen months.

34. Vermeer was only given the chance to tell his side of the story of what transpired in Canada when he returned to the office in Rosharon, Texas to meet with Maxey and a company safety director. Defendant accepted Vermeer's explanation that he had only disposed of the two empty bottles of rum and immediately placed him on a three-day training assignment in preparation for his next long-term assignment.

35. Subsequent events should well have dispelled any lingering doubts Defendant may have had as to whether Vermeer had in fact broken its Canadian client's site rules on alcohol. In or around March 2023, Rick Wilson ("Wilson"), a Mammoet Canada employee, was caught red-handed by the client in Kitimat when a search of his vehicle at the site's security gate found that he had attempted to smuggle in a bottle of alcohol. The contraband in question was a bottle of Captain Morgan rum, and Wilson was residing in the same dormitory that Vermeer had been staying at earlier in the year.

36. After Vermer completed his training, Operations Manager Greg Stanford ("Stanford") assigned him to a new work site in Louisiana and strongly insinuated that it would be a long-term assignment, stating: "You're going to see your retirement here." Based off Stanford's assurances, Vermeer rented an apartment in Louisiana and purchased a new vehicle for work travel.

37. Around March of 2023, Defendant initiated the process of downsizing. Based on the explanation provided to the Equal Employment Opportunity Commission ("EEOC"),

Defendant claims that "[i]n addition to downsizing based on the slowdown in work, Mammoet decided to include individuals who exhibited performance issues."

38. If Defendant truly believed that Vermeer's alleged misconduct was the justified cause of his suspension by its Canadian client, then Defendant would have wasted no time in terminating him either immediately in January 2023, or, at the latest, at the start of the downsizing process in March 2023. Instead, Defendant moved Vermeer to a new work site in Louisiana and indicated to him that he had a long-term future with the company.

39. It was only after Vermeer engaged in protected activity by complaining about Thompson's misconduct in Mexico and expressing frustration over his ongoing Green Card issues in June 2023 that Defendant decided to change course and include him in its August 2023 reduction in force ("RIF").

40. Soon after his return to the United States, Vermeer reached out to Halfweeg to see what Defendant could do about his long-standing desire to get a Green Card. A meeting was scheduled for early June 2023, and Rosalien Uges ("Uges"), Vice-President HR Americas, would also be present.

41. Vermeer recalls that the meeting did not get off to the best start as Halfweeg appeared irritated as Vermeer recounted his visa problems. Sure enough, Vermeer's hopes of securing company support for his Green Card bid were again dashed as he was told that it was not in the budget for the year.

42. During this meeting, Vermeer also complained about the discriminatory way the company handled Thompson's misconduct in Mexico. Uges confirmed to Halfweeg that she was aware of the allegations against Thompson.

43. On August 14, 2023, while working in Louisiana, Vermeer received notification in the early afternoon while out in the field that his presence was required back in Rosharon the very

next morning.  He first finished up his work for the day and then drove eight hours back to Texas, arriving in the early morning hours.

44.     On August 15, 2023, Vermeer met with Resource Director Darrell Brandes and Vice President Tomas Villarino.  Vermeer learned that he and just one other transport supervisor had been singled out among 18 transport supervisors as part of Defendant's reduction in force ("RIF").  This occurred despite Vermeer's strong work record with Defendant and its affiliates and the immense personal sacrifices he had made for the company over the years.

45.     Notably, Thompson, the subject of Vermeer's complaint to Halfweeg and Uges, retained his job despite obvious issues.  To the best of Vermeer's knowledge, Wilson also retained his job during this round of layoffs.

46.     Vermeer was given no specific explanation for why he was selected for the RIF, and a letter he was given at the time states simply that it was "due to business realignment and restructuring."

47.     Only later, in its EEOC Position Statement, did Defendant adjust its story, insisting that "Vermeer's inclusion in the RIF was based on his misconduct while working on-site for one of Mammoet's client[s]."

48.     Defendant's justification does not hold up to the slightest scrutiny.  For starters, it believed Vermeer's explanation to Maxey and its security director enough to offer him a new opportunity in Louisiana despite knowledge of this alleged misconduct in Canada.  Moreover, given Defendant's later awareness that Wilson had been caught trying to smuggle a bottle of Captain Morgan rum into the client's site, it had ample evidence of Vermeer's complete innocence in the matter.

49.     Defendant also sought to impugn Vermeer in its EEOC Position Statement by maintaining that its difficulties with him included "behavioral issues, an inability to trust him

professionally, and subpar quality in his role as a supervisor." No evidence was offered in support of any of these baseless allegations.

50. A true motivating factor in Defendant's decision to terminate Vermeer was his national origin (Dutch), in that the ongoing issues surrounding his immigration status motivated the decision to not retain him whereas American transport supervisors were retained.

51. Vermeer would also not have been terminated but for the protected activity that he engaged in by complaining of the discriminatory manner in which Defendant handled disciplinary matters for American workers in comparison to non-American workers.

52. Put simply, if Vermeer were an American employee with no Green Card issues and no history of complaining about the unfair manner in which the company hands out discipline, he would still be employed by Defendant.

53. Defendant's decision to terminate Vermeer via the August 2023 RIF was discriminatory on the basis of his Dutch national origin and retaliatory in violation of Title VII of the Civil Rights Act of 1964. Vermeer brings this suit to obtain redress for those violations.

## TITLE VII CLAIM OF NATIONAL ORIGIN DISCRIMINATION

54. Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth verbatim.

55. Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

56. To support a Title VII claim, discrimination can be established through direct or circumstantial evidence. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

57. Where the plaintiff has not presented direct summary judgment evidence of

discrimination, courts apply the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the framework, to establish a prima facie case of discrimination in a wrongful termination case, a plaintiff must show that he: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Willis v. Cleco Corp.*, 749 F.3d 314, 319-20 (5th Cir. 2014) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).

58. After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the adverse employment action. *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011); *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

59. The burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black*, 646 F.3d at 259 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (alteration in original).

60. All conditions precedent to this suit have been fulfilled.

61. Vermeer is a member of a protected group based on his Dutch national origin, he was qualified for the job he held, he suffered an adverse action when he was terminated in Defendant's RIF, and he was treated objectively less favorably in comparison to American employees without visa issues.

62. Defendant seeks to justify Vermeer's inclusion in the RIF on the false premise that

he engaged in misconduct on the job. At the same time, Defendant did not terminate at least one American employee, Thompson, who had engaged in verifiable acts of misconduct on the job.

63. Plaintiffs who prevail in a Title VII discrimination claim are entitled to back pay and lost benefits. The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

64. Prevailing plaintiffs are also entitled to reinstatement as an equitable remedy. *See Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 1992). If reinstatement is not feasible, front pay will be awarded in a manner consistent with the remedial purposes of the law. *See Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992).

65. Prevailing plaintiffs are entitled to compensatory and punitive damages under Title VII. *See* 42 U.S.C. § 1981A(a)(1). Prevailing plaintiffs are also entitled to attorney's fees and costs and Plaintiff seeks to recoup these amounts.

## **TITLE VII CLAIM OF RETALIATION**

66. Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth verbatim.

67. To establish a prima facie case of unlawful retaliation under Title VII, the plaintiff must show that: (1) he engaged in protected activity; (2) the employer took an adverse action against him; and (3) a causal link exists between the protected activity and the adverse employment action. *See Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

68. If the plaintiff makes out a prima facie case of retaliation, then the defendant must articulate a legitimate non-retaliatory reason for the adverse employment decision. *See Baker v. American Airlines, Inc.,* 430 F.3d 750, 754-55 (5th Cir. 2005). If the employer does so, the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for

retaliation." *Baker*, 430 F.3d at 755 (internal citations omitted).

69. "Title VII prohibits an employer from retaliating against an employee because that employee has complained about acts of discrimination at work." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003).

70. A plaintiff is not required to establish that an actual violation of Title VII occurred in order to invoke the protections of the anti-retaliation provisions. Rather, a plaintiff only needs to show a reasonable belief that he was being discriminated against and that a complaint was made. *See Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir. 2002).

71. "When an employee communicates to [his] employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to that activity." *Crawford v. Metropolitan Govt. of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (internal quotations omitted).

72. "Close timing between an employee's protected activity and an adverse action against [him] may provide the causal connection required to make out a prima facie case of retaliation." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). A "time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans*, 246 F.3d at 354 (reversing summary judgment on this basis); *Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL 486289, at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link.").

73. In order to show causation as to the ultimate issue of retaliation, i.e. that the protected activity caused the adverse employment action, the employee must establish "that absent his protected activity, the adverse employment action would not have occurred when it did." *Donaldson v. Texas Dept. of Aging and Disability Services*, 495 S.W.3d 421, 441 (App. 1st Dist.—

Houston, 2016). "The employee need not establish that the protected activity was the sole cause of the employment action." *Donaldson* at 441 (internal quotation omitted); *Evans* at 354.

74. But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739 (2020) (internal citation omitted).

75. "Often, events have multiple but-for causes." *Id.* For example, "if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection," both can be but-for causes. *Id.* In employment discrimination cases, "the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Id.* "So long as the protected characteristic or protected activity was one but-for cause of that decision, that is enough to trigger the law." *Id.* (pointing out that the legislature could have added "solely" or "primarily because of" as it has in other statutes, but it chose not to do so here). Accordingly, the protected activity "need not be the sole or primary cause of the employer's adverse action" as the employer in many cases "easily could have pointed to some other, nonprotected trait and insisted it was the more important factor in the adverse employment outcome." *Id.* at 1744.

76. The "existence of a causal link between protected activity and an adverse employment action is a highly fact specific and difficult question." *Smith v. Xerox Corp.*, 371 F. Appx. 514, 520 (5th Cir. 2010) (internal quotation omitted). Indicia of causation may be seen in factors such as: "(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination." *Smith*, 371 F. Appx. at 520.

77. Vermeer can establish a prima facie case of retaliation. He opposed national origin discrimination by reporting the discriminatory way Defendant disciplined Luis, a non-American

employee, in comparison to Thompson, an American employee, who had committed the same offense. Vermeer was terminated in retaliation for that opposition two-and-a-half months after engaging in protected activity.

78. Defendant's newly articulated reason for the separation—that Vermeer engaged in misconduct—is demonstrably false.

79. Like a Title VII discrimination plaintiff, Title VII retaliation plaintiffs are entitled to back pay, compensatory damages, punitive damages, attorney's fees, and costs of court. *See Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 429 (5th Cir. 2022).

80. "A Title VII plaintiff may recover punitive damages upon proof that the defendant acted with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Id.* at 439 (citing 42 U.S.C. § 1981A(b)(1)) (internal quotations omitted).

81. Prevailing plaintiffs are entitled to reinstatement as an equitable remedy. *See Julian v. City of Houston*, Tex., 314 F.3d 721, 729 (5th Cir. 1992). If reinstatement is not feasible, front pay will be awarded in a manner consistent with the remedial purposes of the law. *See Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992). Front pay refers to future lost earnings. Front pay awards can be substantial. *See, e.g., Jackson v. Host Intern., Inc.*, 426 Fed. Appx. 215, 224 (5th Cir. 2011); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004), *vacated on other grounds sub nom, KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995); *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993).

## JURY DEMAND

82. Plaintiff demands a jury trial.

## DAMAGES AND PRAYER

Plaintiff asks that he be awarded a judgment against Defendant for the following:

a. Actual damages in the amount of lost back pay, lost benefits, and other economic losses;

b. Reinstatement or front pay;

c. Compensatory damages;

d. Punitive damages;

e. Pre-judgment and post-judgment interest;

f. Court costs;

g. Attorney's fees; and

h. All other relief to which Plaintiff is justly entitled.

Respectfully submitted,

/s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
S.D. Texas ID No. 2981398
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3558 – Telephone
ak@ahadkhanlaw.com – Email

ATTORNEY FOR PLAINTIFF
GERRIT-JAN VERMEER